UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

ROBERT L. LANGREL         )
         )
V.         )         NO. 2:10-CV-165
         )
MICHAEL J. ASTRUE,         )
Commissioner of Social Security         )

REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of

the Court and 28 U.S.C. § 636 for a report and recommendation.  This is a judicial appeal of

the administrative denial of the plaintiff's application for supplemental security income under

the Social Security Act following a hearing before an Administrative Law Judge ["ALJ"].

Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 10

and 14].

The sole function of this Court in making this review is to determine whether the

findings of the Secretary are supported by substantial evidence in the record.  *McCormick*

*v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988).  "Substantial

evidence" is defined as evidence that a reasonable mind might accept as adequate to support

the challenged conclusion.  *Richardson v. Perales*, 402 U.S. 389 (1971).  It must be enough

to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought

to be drawn is one of fact for the jury.  *Consolo v. Federal Maritime Comm.*, 383 U.S. 607

(1966).  The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor

decide questions of credibility.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even

if the reviewing court were to resolve the factual issues differently, the Secretary's decision

must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Mr. Langrel was 35 years of age, a "younger" individual at the time of the ALJ's ruling. He has a high school education but with a serious "learning disability" to be discussed herein. He has no past relevant work experience.

Plaintiff's school records, relevant to his learning disability, and his medical history are set forth in the defendant Commissioner's brief as follows:

> School records indicate that when Plaintiff was ten years old, he had IQ scores in the low average range of intellectual functioning (Tr. 176-78). The WAIS-R test, taken when Plaintiff was 17 years old, resulted in a verbal IQ score of 84, a performance IQ score of 92, and a full scale IQ score of 87, also indicating low average range of intellectual functioning (Tr. 181-85). Plaintiff's reading was at the fifth grade level (Tr. 184). Plaintiff's relative strengths were identified as sequential reasoning and general comprehension, and his relative weaknesses were in the areas of verbal concepts and conceptual ability (Tr. 181-85). It was determined that Plaintiff met the criteria for the Learning Disabled category (Tr. 183).
>
> Plaintiff received treatment from ETSU Family Physicians from September 2001 to January 2006 (Tr. 191-232). His diagnoses included left hand numbness, fatigue, depression, and insomnia (Tr. 191-232).
>
> Nerve conduction studies, dated December 17, 2004, were consistent with a left ulnar neuropathy and C8 radiculopathy (Tr. 241-42). On February 3, 2005, Lawrence Hartman, M.D, a neurosurgeon, performed a left ulnar nerve decompression (Tr. 197, 233-34). Plaintiff's postoperative diagnosis was left ulnar neuropathy secondary to epineural fibrosis at the cubital tunnel (Tr. 233-34).
>
> Subsequent nerve conduction studies and EMG, on March 18, 2005, indicated marked improvement in Plaintiff's ulnar nerve conduction (Tr. 197, 239-40). The studies of the left upper and lower extremities also showed abnormalities which indicated a systemic process such as polymyositis or possibly some metabolic disorder (Tr. 239-40).
>
> At a follow-up appointment with Dr. Hartman on May 2, 2005, Plaintiff indicated he continued to have some occasional discomfort around the incision, but

that the paresthesia in the fingers had resolved and the strength had improved (Tr. 247). Dr Hartman considered that the followup EMG showed a very substantial improvement in the ulnar nerve conduction velocity, but showed a fairly diffuse muscle irritation, suggesting polymyositis or metabolic disorder (Tr. 247). On examination, Dr. Hartman noted that Plaintiff's left hand strength appeared to be at least moderately improved and sensory examination was essentially intact (Tr. 247). He noted that Plaintiff did not appear to require any further intervention, and he was discharged (Tr. 247).

On March 27, 2007, Karl Konrad, Ph.D., M.D., examined Plaintiff (Tr. 287). Dr. Konrad reported that Plaintiff had full motion in the left shoulder and elbow, as well as a normal gait and station (Tr. 287).

On April, 9, 2007, Mona Mishu M.D., a state agency physician, reviewed the record evidence, and opined that Plaintiff did not have a severe physical impairment (Tr. 288-91).

On September 11, 2008, Samuel Breeding, M.D., performed a consultative examination (Tr. 292-94). Plaintiff complained of back pain, aggravated by bending and lifting; depression; suicidal tendencies; sleepiness; fear of crowds; social withdrawal; difficulty sleeping; and a learning disability (Tr. 293). On physical examination, Plaintiff had a normal gait and station (Tr. 294). He had normal range of motion of all major muscle joints; muscle strength was normal in all major muscle groups; and sitting straight leg raising was negative at 90 degrees (Tr. 294). Plaintiff's deep tendon reflexes were 2+/4, and he had no sensory deficits (Tr. 294). Dr. Breeding diagnosed depression, history of learning disability, and arthralgias (Tr. 292). He stated that he had no objective evidence on which to place any physical restrictions of Plaintiff and opined that Plaintiff's major problem was with psychological issues (Tr. 292-94).

On September 29, 2008, Denise Bell, M.D., another state agency physician, reviewed the record evidence and also opined that Plaintiff did not have a severe physical impairment (Tr. 313-16). On December 30, 2008, Glenda Knox-Carter, M.D., a state agency physician, indicated that Plaintiff did not allege any new impairments, treatments, or worsening since the initial filing, and she adopted Dr. Bell's assessment (Tr. 335).

The treatment notes from ETSU Family Physicians indicated that by November 2004, Plaintiff's depression was stable on medication (Tr. 194, 196, 200).

Plaintiff was admitted at Indian Path Medical Center for a suicide attempt on August 26, 2006 (Tr. 243-46, 256). He was then discharged to Indian Path Pavilion for further evaluation (Tr. 245, 256, 259-62). It was noted that Plaintiff had some legal issues, was currently on probation, and had recently broken up with his girlfriend (Tr. 260). Plaintiff was discharged on August 30, 2006 (Tr. 260). His discharge diagnosis was bipolar disorder type II and polysubstance dependence (Tr. 261). Plaintiff was to follow up with counseling (Tr. 261).

Plaintiff presented to Frontier Health on September 6, 2006, as an aftercare

referral from Indian Path Pavilion (Tr. 269). The report from Frontier Health indicated that Plaintiff's substance abuse began around age 12, and he continued to use sedatives and alcohol currently, but his cocaine abuse was in remission (Tr. 269). He was diagnosed with depressive disorder; alcohol dependence; sedative hypnotic, or anxioloytic dependence; and rule out bipolar disorder and rule out personality disorder (Tr. 269-72). Plaintiff continued treatment at Frontier Health from September 13, 2006 through July 14, 2009 (Tr. 263-68, 317-34, 338-55). Treatment notes from September 13, 2006, indicated that, in reference to the August 2006 hospitalization, Plaintiff stated he had taken an accidental overdose of Halcion, and he denied a suicide attempt (Tr. 265). Subsequent treatment notes from Frontier Health indicated that Plaintiff was generally free of substance abuse (Tr. 263, 265, 317, 319, 323-26, 328, 330, 344, 346, 350, 352). The treatment notes also indicate that Plaintiff had a positive response to treatment with medication (Tr. 263, 326, 328, 330, 344, 346, 350, 352, 354). According to the treatment notes, Plaintiff's mood was generally described as good or euthymic and his affect was, for the most part, pleasant (Tr. 263, 324, 317, 326, 328, 330, 346). During a mental status examination on December 10, 2007, Plaintiff was alert and oriented; his concentration and memory were good, and his thought processes were clear, organized, and coherent (Tr. 326).

Plaintiff indicated increased stress on March 4, 2008, due to the death of his stepmother and relational problems with his girlfriend (Tr. 325), but he reported doing better by April 22, 2008 (Tr. 324). He again reported increased stress on June 19 and August 13, 2008, related to problems with his girlfriend (Tr. 320, 323). By September 15, 2008, Plaintiff reported things were going better with him and especially with his girlfriend (Tr. 319).

During a mental status examination on November 10, 2008, Plaintiff was alert and oriented; his concentration and memory were good, his thought processes were clear and organized and coherent (Tr. 317).

On January 5, 2009, Plaintiff complained of increased stress due to arguing with his girlfriend, and his mood was somewhat depressed (Tr. 352). According to a treatment note from March 2, 2009, Plaintiff's mood was reported as okay (Tr. 350). And, on June 19, 2009, and July 14, 2009, Plaintiff's mood was good, his energy level was adequate, he was sleeping well at night, and he had no problems with appetite (Tr. 3344, 346). Plaintiff's mental status examinations were within normal limits (Tr. 344, 346).

On September 23, 2008, Aileen McAlister, M.D., a state agency psychiatrist, reviewed the record evidence and completed a psychiatric review technique form (PRTF) and a mental residual functional capacity (MRFC) assessment (Tr. 295-312). In the PRTF, Dr. McAlister indicated that Plaintiff had borderline intellectual functioning, learning disability, and depression (Tr. 296, 298). Based on these conditions, she opined that Plaintiff had moderate restrictions in daily activities, social functioning, and maintaining concentration, persistence, or pace (Tr. 305). In section I of the MRFC assessment, entitled "summary conclusions," Dr. McAlister opined that Plaintiff was moderately limited in his abilities to understand, remember,

and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting (Tr. 309-10). In section III of the form, entitled "functional capacity assessment," Dr. McAlister opined that Plaintiff was capable of understanding, remembering, and concentrating to carry out simple and low level detailed tasks; he could interact with coworkers, supervisors, and the general public with some difficulty; and changes in the workplace should be introduced slowly (Tr. 311).

On January 30, 2008, Robert Paul, Ph.D., a sate agency psychologist, reviewed the evidence, and noted that Plaintiff did not allege any new psychological symptoms or any worsening of his previously established complaints (Tr. 336). He affirmed the prior opinion of Dr. McAlister (Tr. 336).

Thomas Schacht, Psy.D., a clinical psychologist, testified as a medical expert the hearing (Tr. 30, 95). Dr. Schacht testified that school records suggested that Plaintiff had overall low average intelligence with likely learning disability in reading that would restrict Plaintiff from jobs that required more than basic literacy (Tr. 31). He noted that Plaintiff's last reading level was at the fifth grade level (Tr. 31).

Dr. Schacht noted that Plaintiff began polysubstance abuse around age 12, but treatment notes from Frontier Health indicated their perception that he had been free of substance abuse for the most part during their treatment of him, which began in September 2006 (Tr. 32). Dr. Schacht testified that the record indicated Plaintiff had a positive response to treatment, and his mood was frequently described as good or euthymic (Tr. 32). He noted that Plaintiff had occasional episodic periods of distress associated with relationship difficulties with a girlfriend, but they had not been persistent (Tr. 32). Dr. Schacht testified that the most recent year's worth of treatment notes, since Fall 2008, showed a stable treatment regimen and benign mental status (Tr. 32). And, the last two notes, from June and July 2009, showed Plaintiff was sleeping well, had a good mood and adequate energy, normal mental status, and no problem with appetite (Tr. 32).

When asked by Plaintiff's attorney whether Plaintiff had a marked impairment in reading comprehension, Dr. Schacht stated, "[t]he test is not a test of comprehension. It's probably a test of ability to do code words, but he is marked, yes." (Tr. 34).

[Doc. 15, pgs. 2-9].

The ALJ called Dr. Norman Hankins, a vocational expert ["VE"]. He asked Dr.

Hankins if he had read the plaintiff's file, and he responded affirmatively. He asked him to

5

assume a person with plaintiff's age, education and work experience. He also asked him to assume the person could do medium work which was simple routine and repetitive, that the person was better with things than people, and could frequently use the left upper extremity. When asked if there were jobs, Dr. Hankins identified janitors, building cleaners, housekeeping cleaners and ground maintenance workers, with 50,000 such jobs in Tennessee and 2 million in the national economy. At the light level there would be 20,000 in the state and 1,000,000 in the nation. At the sedentary level, with jobs such as assemblers and packers, there would be 5,100 in the state and 200,000 in the nation. He also stated that even if plaintiff were limited as he testified he was, Dr. Hankins said "I didn't hear him mention any problems that there would, that he wouldn't be able to work at all." (Tr. 35-38).

On cross examination, Dr. Hankins was asked what "the SVP levels of the jobs you identified" are, and if any required an SVP at a level greater than two.[1] (Tr. 38). Dr. Hankins replied that none would require more than an SVP level two. He then explained that a language level of one under the Dictionary of Occupational Titles ["DOT"] would be at the third grade level. A level of two would be at the sixth grade level. (Tr. 39). When asked if having a language level of one would reduce the number of jobs, Dr. Hankins stated "I don't see any of the jobs that I mentioned here because if we move that down to a one, that would really reduce the number of jobs that would exist." (Tr. 40).

In his hearing decision, the ALJ Found that the plaintiff had a severe impairments of left arm impairment and a learning disorder. He found that his impairments singly or in

_____

[1] An "SVP Level" in this circumstance, is referring to the person's language skills and the various levels are defined in the Dictionary of Occupational titles and set out further on in this report and recommendation.

combination did not equal or meet a listed impairment. (Tr. 11). Mentally, he found that the plaintiff had a mild restriction in activities of daily living, as opposed to the State Agency consultant who felt that the restriction was moderate. The ALJ based this upon the plaintiff's testimony that he used a computer, visits his father, cares for a pet, makes simple meals, performs laundry chores, cleans, drive a car, mows his grass, shops, pays bills and manages his bank account. He found that the plaintiff had moderate difficulties in dealing with the general public, co-workers and supervisors and in concentration, persistence and pace. In this he agreed with the State Agency psychiatrist, and noted that "the psychiatrist concluded that he could understand, remember and concentrate on simple low level detailed tasks." (Tr. 12). He found that there had been no episodes of decompensation.

He found that the plaintiff "has the residual functional capacity ["RFC"] to perform medium work as defined in (the regulations) except that he is limited to frequent use of his non-dominant left arm; restricted to simple, routine and repetitive work; and he is better working with things than with people." He also assumed he could do light and sedentary work with those same restrictions. (Tr. 12).

He found that the plaintiff was not credible as to the effects of his conditions "to the extent they are inconsistent" with the ALJ's finding on RFC. He recounted the fact that two consultative examiners and one state agency physician found the plaintiff had no physical restrictions. (Tr. 13). He then recounted the mental evidence, including test scores and plaintiff's IQ. He discussed the improvement and control of symptoms by the plaintiff's treating mental health sources. He discussed the State Agency findings and gave them great weight except for the previously explained rejection of a marked restriction in activities of

daily living. (Tr. 14). Based upon the testimony of the VE, he found that there was a significant number of jobs the plaintiff could perform. Accordingly, he found that he was not disabled. (Tr. 15-16).

Plaintiff argues that his mental impairments "are more serious and more limiting" than found by the ALJ. He asserts that that ALJ failed to include the limitations noted by the State Agency psychiatrist in his RFC finding and his questions to the VE. He points out that the VE's testimony indicated that the plaintiff could not perform some great portion of the jobs he identified if plaintiff had only "Level 1" language skills. He takes issue with the ALJ's determination that the plaintiff was not credible in any assertion that he was limited to and extent inconsistent with the ALJ's RFC finding. He says that the plaintiff's left arm impairment was more limiting than found by the ALJ. Finally, he says that the ALJ did not properly consider the combined effects of the left arm and mental impairments.

As previously stated, the sole role of a district court in reviewing the Commissioner's decision is to see if there is substantial evidence to support the findings of the ALJ and to make sure that applicable regulations were observed. Dr. Schacht, the psychological advisor at the hearing who read the plaintiff's file, observed and actually questioned plaintiff at the hearing, and testified is, under Sixth Circuit precedent, a highly reliable source regarding the nature and severity of the plaintiff's difficulties. *See*, *Barker v. Shalala* 40 F.3d 789 (6th Cir. 1994). He pointed out that the plaintiff's problems with depression and substance abuse have responded exceedingly well to treatment, and that he has exhibited a "benign mental status" since the fall of 2008. The treatment notes described the plaintiff's "mood as good, his energy is adequate, sleeping well, no problems with appetite, his mental status was within

normal limits." (Tr. 32). If plaintiff was experiencing any residual symptoms, the record did not reflect any.

As for the argument that the ALJ failed to include the moderate limitation in activities of daily living opined by Dr. McAlister, the State Agency Psychologist, as the Commissioner points out, that "worksheet" (Tr. 305) is not, under Social Security's Program Operations Manual System, the evaluator's opinion on RFC. That is found elsewhere (Tr. 309-11), and states that the plaintiff is "capable of understanding, remembering and concentrating to carry out simple and low level detailed tasks." Dr. McAlister also states that he "can interact with coworkers, supervisors, and general public with some difficulty. Changes in the workplace should be introduced slowly." (Tr. 311). The ALJ's RFC and hypothetical restricted the plaintiff to simple, routine, repetitive work with things rather than people. Also, as pointed out by the ALJ, the degree of restriction in activities of daily living, which was not critical to the ultimate opinion of Dr. McAlister on RFC, was not consistent with the activities plaintiff described himself as doing. The ALJ adequately considered and largely accepted the opinion of Dr. McAlister, and did accept her RFC opinion.

The plaintiff also asserts that the ALJ was in error in finding him less than credible. Credibility is a relatively minor issue here, since Dr. Hankins opined that the plaintiff could still work even if all of his testimony was true. More important is the ALJ's explanation of how he arrived at the finding of RFC, and the substantial evidence which supports that. This argument is without merit.

With respect to the plaintiff's left arm imposing greater limitations than found by the ALJ, the medical proof is overwhelming that he has minimal limitation. As the ALJ said, it

was giving the plaintiff every benefit of the doubt to even find that he still had a severe impairment with his arm. The ALJ's finding that he could use it "frequently" is sufficient to describe any impairment he may have in the use of his non-dominant arm. This is also true of the argument that the ALJ did not adequately consider the left arm limitation and mental impairment in combination.

The final issue is whether the plaintiff can perform the jobs identified by Dr. Hankins with his "Level" of language skills. Dr. Hankins testified that "if we move that down to a (Level) 1, that would really reduce the number of jobs that would exist." (Tr. 40). The DOT defines these Levels at Appendix C of 1991 WL 688702 as follows:

> Language: Level 1-Reading: Recognize meaning of 2,500 (two- or three-syllable words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers. Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses. Speaking: Speak simple sentences, using normal word order, and present and past tenses.
> Language: Level 2-Reading: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes. Writing: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs. Speaking: Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses.

Dr. Schacht testified that the record indicated that the plaintiff had a fifth grade reading level. (Tr. 31). Dr. Hankins testified that a Level 1 language level corresponded to a third grade level, while a Level 2 language level is a sixth grade level. (Tr. 39). The best evidence in the record indicates that the plaintiff's Level is much more than Level 1 but not quite Level 2. It is significantly closer to Level 2 than Level 1. This is a minuscule difference, in the opinion of this Court, and thus Dr. Hankins' number of jobs is supported

by substantial evidence.

In the opinion of the Court, substantial evidence supports the ALJ's findings and he committed no errors of law. It is therefore respectfully recommended that the plaintiff's Motion for Summary Judgment [Doc. 10] be DENIED, and the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be GRANTED.[2]

Respectfully submitted:

_s/ Dennis H. Inman_____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).

11